1
2                          UNITED STATES DISTRICT COURT
                             DISTRICT OF PUERTO RICO
3
4

IVIS COLON-VAZQUEZ, et al.,

          Plaintiffs,                        Civil No. 3:14-cv-01644 (JAF)

          v.

DEPARTMENT OF EDUCATION OF
PUERTO RICO, et al.,

          Defendants.

5
6                              **OPINION AND ORDER**

7         This matter appears before the court on Plaintiffs' Motion for Preliminary Injunction,[1] filed

8    on August 25, 2014. (Docket No. 2.)

9                                          **I.**

10                                   **Introduction**

11                                         **A.**

12        The judge is a citizen in the community he serves and is exposed to the same benefits and

13   inconveniences of a non-judicial citizen.  Judges are not silent observers of processes before the

14   court; they have a role to play in the difficult task of delivering some form of acceptable justice to

15   the litigants before the tribunal.  Judges cannot escape being incensed by injustice or mediocrity

16   resulting from executive, legislative, and private forces and interests.  When it comes to

17   education, the judge knows about the value of it and of the maddening effects of governmental

18   institutionalized indifference to acceptable standards in public education.

---

[1] Plaintiffs also moved for a permanent injunction at Docket No. 2.  This Opinion and Order decides the matter of the
preliminary injunction only.  Plaintiffs' motion for permanent injunction remains pending.

Civil No. 3:14-cv-01644 (JAF)                                             -2-

1    This case, simple in its facts, is a loud cry for action that makes one ponder: How is it

2    possible that the unacceptable problems of special public education have not been able to see

3    closure after thirty-four years of state court litigation governed by a judgment entered on February

4    14, 2002, in the case of *Rosa Lydia Vélez et al. v. Department of Education*, Superior Court, San

5    Juan, Case #KPE1980-1738 (804).

6                                               **B.**

7    As an introductory note, it is no secret that the quality level of education in public schools

8    in Puerto Rico is poor, broken, embarrassing, negligent, disgraceful, pitiful, and dishonorable.

9    The judge or the reader does not have to be a rocket scientist to realize that a school system

10   where a large proportion of its students fail Puerto Rican tests on academic performance is a

11   shame that all Puerto Ricans must shoulder. Eighty-five percent (85%) of over 1,800 public

12   schools are in the improvement program. As of September 2014, figures have been published

13   showing that recently sixty percent (60%) of students failed the Spanish academic performance

14   tests in their respective grades, sixty-one percent (61%) failed the English tests, and seventy-five

15   percent (75%) failed the mathematics tests.

16   The Caribbean Business September 2014 edition[2] reports as follows:

17        To be in accordance with the federal No Child Left Behind Act, all
18        students in the Puerto Rico public school system must pass the
19        tests by 2014. The system's dropout rate, meanwhile, is about
20        12%. In general, urban schools, especially those located in poorer
21        neighborhoods, tend to do worse than their counterparts located in
22        more suburban or middle-class areas or in smaller towns.
23

---

[2]    Caribbean    Business,    *A    look    at    Puerto    Rico's    education    system*
http://www.caribbeanbusiness.pr/cbdirectory/cb_education.php?cat_id=09, last visited September 11, 2014.

1    The Department of Education has a consolidated budget of $3.8
2    billion, much more than any other government agency, including
3    the Health and the Police departments. But the Education
4    Department has had three different secretaries over a 22-month
5    period starting in January 2009, and seems most focused on
6    meeting the requirements to qualify for federal funds. Meanwhile,
7    the two main teachers' unions—The Teachers Federation of Puerto
8    Rico (FMPR by its Spanish acronym) and the Puerto Rico
9    Teachers Association (AMPR by its Spanish acronym) have either
10   expressed reservations, or opposed (in the case of the FMPR) the
11   most recent appointee to head the Education Department.

13   As of August 2010, public schools had 436,741 students from
14   kindergarten through to the high-school level, roughly twice the
15   number of students attending private schools. In October 2010,
16   more than 200,000 students were enrolled in 1,078 licensed private
17   schools ranging from preschools to those that offer classes at the
18   high-school level.

## C.

21       The picture depicted above pales in comparison with the problem of special education that

22   is the subject of this particular case.  When one examines Court Exhibit 3, the 2012-2013 monitor

23   report in the *Rosa Lydia Vélez* 34-year-old litigation, one's jaw drops at the August 26, 2014,

24   conclusion by the monitor, Dr. Pilar Beléndez-Soltero.  The level of compliance with 69 identified

25   judgment dispositions of special education needs was 1.99.  A score of 1.99 in the applicable scale

26   is between fifty percent (50%) and no more than sixty-nine percent (69%) compliance, meaning

27   under acceptable levels and requiring a plan for corrective action.  Thirty-four years of paper

28   pushing and excuses. Thirty-four years of inefficiency and mediocrity where the victim is the

29   child whose parents cannot afford private education – the only acceptable recourse to this tragedy

30   these days.  But for those who have the ability to pay, private education has become common.

31   The statistics show that roughly one-third (1/3) of Puerto Ricans ranging from preschool to high-

1  school attend private schools.  Superior private education is creating a superclass of privileged

2  students against whom the best majority of the publicly-educated cannot and will never be able to

3  compete on an equal footing.  That is unfair to the less privileged.  Indeed, such government-

4  created inequality creates an ever-growing chasm between Puerto Rico's haves and its have nots -

5  an almost caste structure within our education system.

6                                                 **D.**

7           Going now to the present case, Plaintiff Ivis Colón-Vázquez is the single, widowed mother

8  of Plaintiff ECC, a minor who suffers from hearing problems, vision problems, diabetes, a heart

9  murmur, and ADHD-related health problems associated with Down syndrome.  This is not the

10  first occurrence where Plaintiff Colón has had to resort to the justice system to get the Department

11  of Education to comply with what the law provides or legislative remedies to deal with the special

12  education needs of ECC.  One of the previous suits was mentioned during the preliminary

13  injunction hearing held on September 9 and 10, 2014.  The court also has access to the full record

14  of a district court case that ended in a favorable judgment for Plaintiff Colón[3] and access to the

15  recent, June 24, 2014, decision by an Administrative Law Judge, the decision which is, in part, the

16  basis of this matter (Joint Ex. 1).

17                                                 **II.**

18                                  **Background and Procedural History**

19           Plaintiff Ivis Colón-Vázquez ("Colón") filed an administrative complaint on behalf of her

20  minor child, ECC, against the Department of Education of Puerto Rico ("DOE") on May 5, 2014.

---

[3] *Colon-Vazquez et al v. Commonwealth of Puerto Rico et al.*, United States District Court for the District of Puerto Rico (San Juan), Case No. 3:13-cv-01175.

1   According to Plaintiff Colón, ECC is diagnosed with ADHD-related health issues associated with

2   Down syndrome.   ECC attends school at the Dr. Hiram González School in Bayamón ("the

3   School").  The School has not been providing ECC with special needs education as required under

4   the Individuals with Disabilities Education Act, 20 U.S.C. §1400 *et seq.*, ("IDEA").

5          On June 24, 2014, the Administrative Law Judge ("ALJ") granted Plaintiffs' complaint and

6   ordered the following:

7           a.   That the DOE name a special education teacher to be ready by the start of
8                the academic year, that is, August 6, 2014;
9
10          b.   That, on or before July 16, 2014, the DOE hold a [IEP Team[4]] meeting with
11               the purpose of creating ECC's Individualized Educational Plan ("IEP") for
12               the 2014-2015 school year;
13
14          c.   That ECC be granted the "compensatory time" that she has not received as
15               well as that which she did not receive during the summer of 2014;
16
17          d.   That, in a term of twenty-five (25) days (counted from June 24, 2014), the
18               DOE determine the amount that is owed to Colón, pursuant to the rates
19               certified by the Puerto Rico Public Service Commission, for transportation
20               expenses, and that, once that amount is determined, the same be paid to
21               Colón in a term not to exceed thirty (30) days;
22
23          e.   That, starting in August 2014, ECC be provided with the dietary needs
24               ordered by the [School Food Authority];
25
26          f.   That, for the 2014-2015 academic year, the DOE consider naming "Y.A" as
27               the Services Assistant ("T1") at school for ECC, and in the alternative, that
28               it make the efforts to name a different Services Assistant ("T1") to provide
29               services to ECC starting on the first day of the 2014-2015 school year, that
30               is, August 6, 2014. The ALJ also ordered that, if the T1 had not started
31               providing services to ECC by August 18, 2014, then the DOE must activate
32               the "provisional remedy" ("Remedio Provisional") in order to provide ECC
33               with the services of an Assistant.
34

---

[4] In Spanish, the IEP Team is called the "Comité de Programación y Ubicación de Educación Especial" and is often
referred to as the COMPU.

1  (The ALJ's order will hereinafter be referred to as the "Resolution".) Motions for reconsideration

2  of the Resolution were to be filed within twenty (20) days from June 24, 2014, i.e., by July 14,

3  2014.  The DOE did not move for reconsideration.  Requests for review of the Resolution before

4  the Court of Appeals were to be filed within thirty (30) days of June 24, 2014, i.e., by July 24,

5  2014.  The DOE did not appeal the ALJ's Resolution.  Accordingly, the determination by the ALJ

6  is final. *See e.g.* 20 U.S.C. § 1414(i)(1)(A).

7       On August 25, 2014, Plaintiff Colón filed a complaint in the U.S. District Court for the

8  District of Puerto Rico on behalf of ECC and herself individually.   According to Plaintiff Colón,

9  the DOE has not complied with the Resolution.  The complaint requests this court to find that the

10 DOE has violated the IDEA, to issue injunctive relief requiring the DOE to comply with the

11 Resolution, and to award costs, expenses, and attorney's fees as authorized by the IDEA.

12      The court held a hearing on the preliminary injunction on September 9 and 10, 2014.  The

13 court heard testimony from several witnesses: 1) Plaintiff Ivis Colón-Vázquez; 2) Lourdes Noemí

14 García-Santiago, a nutritionist employed at DOE ("García"); 3) Yailín Alvarado-Jiménez,

15 Plaintiff ECC's special assistant ("Alvarado"); 4) Lourdes Agosto-Meléndez, a transportation

16 technician in the Special Education Program at the DOE ("Agosto"); and 5) Neuris Contreras-

17 Ojeda, Director of the Dr. Hiram González School ("Director Contreras").

18      After considering the briefs, case law, exhibits, and testimony during the preliminary

19 injunction, the court finds that Plaintiffs' likelihood of success on the merits is substantial and, for

20 the reasons stated below, Plaintiffs' motion for preliminary injunction is **GRANTED**.

21

1       **III.**

2       <u>**Standard for Preliminary Injunction**</u>

3              When determining whether to grant a preliminary injunction, the court evaluates four

4       factors:  "(1) the movant's probability of success on the merits, (2) the likelihood of irreparable

5       harm absent preliminary injunctive relief, (3) a comparison between the harm to the movant if no

6       injunction issues and the harm to the objectors if one does issue, and (4) how the granting or

7       denial of an injunction will interact with the public interest."  *New Comm Wireless Servs., Inc. v.*

8       *SprintCom, Inc.*, 287 F.3d 1, 8-9 (1st Cir. 2002) (*citing Ross–Simons of Warwick, Inc. v.*

9       *Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996)).  "The sine qua non of this four-part inquiry is

10      likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to

11      succeed in his quest, the remaining factors become matters of idle curiosity."  *Id*. (*citing Weaver*

12      *v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)).

13      **IV.**

14      <u>**Analysis**</u>

15      A.      <u>**Probability of Success on the Merits**</u>

16             The first question this court must decide is whether Plaintiffs are likely to successfully

17      prove that the DOE has violated IDEA with respect to its treatment of ECC.

18             1.      <u>**Failure to create a 2014-2015 Individualized Education Program for ECC**</u>

19             Under the IDEA, a state receiving federal funds for the education of handicapped children

20      must provide those children with a "free appropriate public education;"  in this context, "free

21      appropriate public education" consists of educational instruction designed to meet the unique

22      needs of the handicapped child, supported by such services as are necessary to permit the child to

1    benefit from the instruction, and benefit conferred by this special education must be meaningful

2    and not trivial or *de minimis*.   20 U.S.C. § 1400, *et seq.* The DOE is the agency of the

3    Commonwealth of Puerto Rico responsible for providing and administering the public education

4    system in Puerto Rico. As a recipient of federal funding, the DOE is responsible for providing a

5    free appropriate public education suited to the particular needs of minor ECC, a child with

6    disabilities.

7          To ensure that children with disabilities have access to a free appropriate public education,

8    the IDEA directs the child's parents, teachers, and other professionals (the "IEP Team") to

9    develop for each special education student an Individualized Education Program[5] ("IEP") that sets

10   forth the required instructions and services designed to meet the particular child's unique needs.

11   *See* 20 U.S.C. § 1414(d). Once the IEP is developed, the school system must provide an

12   appropriate placement that meets those needs and, if an appropriate public placement is

13   unavailable, the school system must provide an appropriate private placement or make available

14   educational-related services provided by private organizations to supplement a public placement.

15   *See* 20 U.S.C. § 1412(a)(10); 34 C.F.R. §§ 300.349, 300.400–402.  The IDEA requires that an IEP

16   be in effect at the beginning of the school year for each child with a disability.  *See* 20 U.S.C.

17   § 1414(d)(2)(A).

18         There is no dispute that a current IEP is not in effect for ECC. ECC is currently taking

19   classes at the 5th grade level for the 2014-2015 school year; yet, the most recent IEP for her

20   includes objectives and goals for the previous school year. Given that it is undisputed that an IEP

21   for ECC was not in effect by the first day of this school year, specifically by August 6, 2014, the

---

[5] In Spanish, the IEP is called a "Programa Educativo Individualizado" and is often referred to as the PEI.

1  court would be right to conclude that the DOE is unquestionably in violation of the IDEA.  *See,*

2  *e.g., Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 238–39 (2009) **("[W]hen a child requires**

3  **special-education services, a school district's failure to propose an IEP of any kind is at least**

4  **as serious a violation of its responsibilities under IDEA as a failure to provide an adequate**

5  **IEP.**" (*emphasis added*).)

6          The parties, however, dispute the fault for the School's failure to initiate an IEP for the

7  2014-2015 school year.  The DOE argues that on several occasions the School invited Plaintiff

8  Colón to an IEP Team meeting; yet, she either declined or failed to attend.

9          The DOE's blame of Plaintiff Colón for its failure to comply with the IDEA is not

10  supported by the facts.  The last day of school for the 2013-2014 school year was May 30, 2014.

11  The first day of the 2014-2015 school year was August 6, 2014.  Director Contreras acknowledges

12  that ECC attended the School in 2013-2014 and that ECC would attend the School the following

13  year.  The DOE does not argue that efforts were made prior to the end of the 2013-2014 school

14  year to hold an IEP Team meeting to discuss the following year's IEP for ECC.

15          The administrative hearing was held on June 17, 2014. Plaintiff Colón and her counsel

16  appeared, and an attorney from the Special Education Legal Division, along with an investigator,

17  appeared on behalf of the DOE.  Plaintiff Colón testified at the administrative hearing that the IEP

18  Team had not met to prepare the 2014-2015 IEP for ECC.

19          On June 24, 2014, the ALJ issued an order requiring, *inter alia*, the DOE to "coordinate

20  and hold an [IEP Team] meeting…within thirty (30) days as of June 17, 2014, with the purpose of

21  preparing [ECC's] 2014-2015 IEP and discuss any other matter related to the special education

1   services that the student requires[.]" (Docket No. 15-4).  Thus, compliance with the Resolution

2   required the DOE to hold an IEP Team meeting no later than July 17, 2014.

3           On August 11, 2014, Plaintiff Colón approached Director Contreras regarding a date for

4   the IEP meeting. On August 12, 2014, Plaintiff Colón received a letter from Director Contreras

5   containing three different dates for the IEP Team meeting. That letter offered August 13, 14, or 15

6   as possible dates for the meeting.  The School did not include a copy of the draft of the 2014-2015

7   IEP for Plaintiff Colón to review and prepare for the IEP Team meeting.

8           Upon receipt of the invitation, Plaintiff Colón approached Mr. Amilcar De León from the

9   Municipality of Bayamón to discuss her frustration with the School regarding its failure to draft

10  ECC's IEP for 2014-2015.  As a result of that conversation, Carmen Pereles-Centeno, Faculty

11  Facilitator in the Technical Assistance Unit of the DOE (hereinafter, "Pereles"), contacted

12  Plaintiff Colón to schedule a meeting on August 21, 2014, to discuss "matters regarding the case

13  of your daughter ECC[.]"  (Plaintiffs' Ex. 1.) Plaintiff Colón responded to Pereles' letter on

14  August 19, 2014.  In her response, she stated unequivocally that she would not attend the informal

15  meeting on August 21, 2014.  Plaintiff Colón stated that "[a]s soon as I am summoned pursuant to

16  the law and with prior notification provided by the law for holding [IEP Team] meeting to

17  coordinate the 2014-2015 [IEP], as ordered by the [ALJ's order], I will attend that meeting."

18  (Plaintiffs' Ex. 2.)  That same day, the School emailed[6] Plaintiff Colón inviting her to attend an

19  IEP Team meeting on August 21, 2014. A draft of the 2014-2015 IEP for ECC was not included

---

[6] There was testimony that the email notification was originally sent to a rarely used email address for Plaintiff Colón and possible issues with the email delivery and receipt to her proper address.

1   with the email.  Plaintiff Colón stated she had already declined her availability for August 21,

2   2014.

3          On August 25, the School sent another invitation to attend an IEP Team meeting set for

4   September 3, 2014; a draft of the 2014-2015 IEP for ECC was not included with the email.   In

5   response, Plaintiff Colón proposed the dates of September 8, 9, and 10 to hold the IEP Team

6   meeting. Counsel for the DOE, however, rejected these dates.  On August 29, 2014, the School

7   communicated an invitation to attend an IEP Team meeting on September 8, 2014.  By then, the

8   preliminary hearing had been scheduled for September 9, 2014, and Plaintiff Colón declined the

9   invitation (set for a date that she had previously suggested but the DOE rejected) to prepare for the

10  hearing.

11         Through the testimony and exhibits before this court, it is clear that neither the DOE nor

12  the School made any effort to comply with the ALJ's order.  Director Contreras testified that she

13  was unaware of the administrative complaint until July 4th or 5th when she received a copy of the

14  ALJ's Order by email. **Clearly, the DOE did not even find it necessary to advise the Director**

15  **of the School that an issue had arisen involving one of her special education students.**  Upon

16  receiving notice of the ALJ's order, Director Contreras contacted the DOE's attorney to discuss

17  her ability to comply with the Order, and the DOE's attorney advised her to do nothing until the

18  first day of classes.  In fact, the very first time the School or the DOE communicated with Plaintiff

19  Colón about scheduling an IEP Team meeting was August 11, 2014, **after** the August 6th

20  deadline required by both the Resolution and the IDEA.  Again, there is no question that the DOE

21  violated the IDEA by failing to have in place an IEP for ECC prior to the beginning of the school

22  year.

1    Plaintiff Colón claims that the DOE failed to give her adequate notice of the proposed

2    dates for the IEP Team meeting. In order for a parent to effectively participate in and contribute to

3    the process of developing an appropriate IEP for their child, the parent must know what the school

4    proposes to do and why, and what has been going on with the child at school. Therefore, before a

5    team meeting at which the school district proposes to adopt or amend an individualized education

6    program, the school district must provide the parents with prior written notice (20 U.S.C.

7    § 1415(b)(3)), an opportunity to review all records pertaining to their child (20 U.S.C.

8    § 1415(b)(1)), and a full explanation of their rights, including their rights to participate, object,

9    and appeal (20 U.S.C. § 1415(d)(1)(A)).  Prior written notice shall include:

10    (A) a description of the action proposed or refused by the agency;

12    (B) an explanation of why the agency proposes or refuses to take the action and a
13        description of each evaluation procedure, assessment, record, or report the
14        agency used as a basis for the proposed or refused action;

16    (C) a statement that the parents of a child with a disability have protection under
17        the procedural safeguards of this subchapter and, if this notice is not an initial
18        referral for evaluation, the means by which a copy of a description of the
19        procedural safeguards can be obtained;

21    (D) sources for parents to contact to obtain assistance in understanding the
22        provisions of this subchapter;

24    (E) a description of other options considered by the IEP Team and the reason why
25        those options were rejected; and

27    (F)  a description of the factors that are relevant to the agency's proposal or refusal.

28    20 U.S.C. § 1415(c)(1).

30    Plaintiff Colón asserts that the DOE's invitations failed to comply with the notice

31    requirements by: 1) not including a draft of the proposed IEP; 2) not giving her at least five days'

32    notice nor three dates to choose from; and 3) proposing dates previously rejected by Plaintiff

1   Colón and/or the DOE.  The School alleges that it intended to provide Plaintiff Colón with a draft

2   of the IEP at the team meeting and that on several occasions it attempted to notify Plaintiff Colón

3   of the IEP Team meeting yet she declined to attend.

4          The IDEA does not specify a drop-dead deadline for providing parents with written notice

5   of an anticipated IEP Team meeting; however, parents should receive prior written notice a

6   reasonable time before the school plans to take (or refuses to take) actions related to the child's

7   free appropriate public education.

8          Moreover, in this case, the manual for special education programs provided by the DOE

9   and the School specifies the procedure for providing parents notice of IEP Team meetings. (Joint

10  Ex. 2.)  The manual requires that an invitation to the IEP Team meeting be sent to the parents at

11  least ten days prior to the anticipated hearing date.  The ten-day advance notice may be shortened

12  when the parties are able to mutually agree upon a date.  Here, the School and Plaintiff Colón

13  never mutually agreed upon a date and the School consistently gave Plaintiff Colón less than ten

14  days' notice.

15         The court finds the School's efforts to schedule the IEP Team meeting disingenuous at

16  best. First, the dates chosen by the School suggest a pattern of evading Plaintiff Colón while

17  attempting to **appear** to comply with the notice requirements. The School provided Plaintiff

18  Colón with notice of an IEP Team meeting for the following day. The draft IEP was not included,

19  nor were any materials or records included for Plaintiff Colón to review prior to the meeting. The

20  School stated that it planned to give Plaintiff Colón a copy of the draft IEP during the meeting,

21  but there is no evidence that a draft IEP has ever been prepared for ECC for this school year. For

22  the second attempt to invite Plaintiff Colón to the IEP meeting, the School chose a date on which

Civil No. 3:14-cv-01644 (JAF)                                                           -14-

1    she had already expressed her unavailability to attend any meeting to Pereles.  In the School's last

2    attempt, the School selected a date for the meeting that Plaintiff Colón had already been told

3    would not work by the DOE's attorney.

4            Second, not all persons required to attend the IEP Team meeting were invited to attend the

5    meeting.  Under the IDEA, the IEP Team is comprised of:

6            (i)      the parents of a child with a disability;

8            (ii)     not less than 1 regular education teacher of such child (if the child is, or
9                     may be, participating in the regular education environment);

11           (iii)    not less than 1 special education teacher, or where appropriate, not less than
12                    1 special education provider of such child;

14           (iv)     a representative of the local educational agency who—

16                    (I)      is qualified to provide, or supervise the provision of, specially
17                             designed instruction to meet the unique needs of children with
18                             disabilities;

20                    (II)     is knowledgeable about the general education curriculum; and

22                    (III)    is knowledgeable about the availability of resources of the local
23                             educational agency;

25           (v)      an individual who can interpret the instructional implications of evaluation
26                    results, who may be a member of the team described in clauses (ii) through
27                    (vi);

29           (vi)     at the discretion of the parent or the agency, other individuals who have
30                    knowledge or special expertise regarding the child, including related
31                    services personnel as appropriate; and

33           (vii)    whenever appropriate, the child with a disability.

35   20 U.S.C.A. § 1414(d)(1)(B).

1       There is no indication in the August 12, 2014, "invitation" as to who would be attending

2   the proposed IEP Team meeting. This invitation fails to comply with the notice requirements of

3   the IDEA.

4       The August 19, 2014, invitation, signed by Pereles, lists: (1) Carmen Marrero, "special

5   education teacher"; (2) Director Contreras; (3) Gladys Aponte-Rivera, regular teacher; (4) Ana

6   Rivera, other; and (5) Pereles, special education facilitator.  The facts show, however, that no

7   special education teacher was assigned to ECC as of August 19, 2014.  In fact, Ms. Marrero was

8   not appointed as the special education instructor for the resource room until September 2, 2014.

9   **This second invitation is misleading and attempts to hide the fact that the DOE had failed to**

10  **comply with the Resolution.** One cannot simply check a box and call a person a special

11  education instructor to get around the requirements of the IDEA.

12      The same issues apply to the invitation dated August 25, 2014.  This invitation was signed

13  by Ms. Marrero as "special education teacher."  Although this invitation sets the date for the IEP

14  Team meeting as September 3, 2014, as of August 25, 2014, no special education teacher had yet

15  been appointed to the resource room.

16      Finally, the School's failure to provide Plaintiff Colón with a draft of ECC's IEP for 2014-

17  2015 and any other records for Plaintiff Colón to review in preparation for the IEP Team meeting

18  is also concerning.  The DOE's manual on special education specifically states that five (5) days

19  prior to the anticipated date of an IEP Team meeting, the DOE shall provide a copy of the results

20  of previous assessments for consideration in the preparation of the IEP.  Similarly, the IDEA

21  requires that parents receive proper and specific prior written notice (20 U.S.C. § 1415(b)(3)), an

22  opportunity to review all records pertaining to their child (20 U.S.C. § 1415(b)(1)), and a full

1   explanation of their rights, including their rights to participate, object, and appeal (20 U.S.C. §

2   1415(d)(1)(A).   The record before the court is devoid of any evidence that Plaintiff Colón

3   received proper notice of the IEP Team meetings under the requirements of both the DOE's

4   manual and the IDEA.

5        It appears that no real efforts were made to hold a meaningful and well-informed IEP Team

6   meeting regarding ECC. Throughout the factual background of this case, the DOE and the School

7   either lacked basic communication with each other **or they are involved in a deceitful game of**

8   **pointing fingers of blame at each other and, likewise, at Plaintiff Colón.**

9        Deceit is akin to thirty-four years of non-compliance; but, regardless of which scenario is

10  correct, the court finds that Plaintiffs are substantially likely to succeed on the merits of their

11  claim against the DOE for violating the IDEA by failing to have in place an IEP for ECC prior to

12  the beginning of the school year. Because the School/DOE was, and continues to be, obligated to

13  prepare a 2014-2015 IEP for ECC and has admittedly failed to do so, the DOE has failed to

14  provide ECC with a free appropriate public education, thereby violating the IDEA.

15      **2.**      **<u>Failure to Implement 2013-2014 IEP</u>**

16       Plaintiffs also claim that the DOE failed to comply with the 2013-2014 IEP.  The IDEA

17  defines a free appropriate public education as including the district's obligation to provide

18  "special education and related services . . . *in conformity with the individualized education*

19  *program*." 20 U.S.C. § 1401(9) (emphasis added).  A claim alleging noncompliance with an

20  appropriately-developed and formulated IEP is distinct from a claim alleging that an IEP was

21  "inappropriate" in the first place. *Sumter County. Sch. Dist. 17 v. Heffernan*, 642 F.3d 478, 484

22  (4th Cir. 2011); *Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir.

1  2007); *Neosho R–V Sch. Dist. v. Clark*, 315 F.3d 1022, 1027 n. 3 (8th Cir. 2003); *Houston Indep.*

2  *Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000); *and see Ross v Framingham School*

3  *Committee*, 44 F.Supp.2d 104, 116 (D. Mass. Apr. 21, 1999), aff'd, 229 F.3d 1133 (1st Cir. 2000).

4          The First Circuit appears not to have addressed the question of whether failure to provide

5  all of the services outlined in an IEP constitutes a per-se violation of the IDEA.  Federal courts

6  that have addressed it have generally adopted the standard articulated by the Fifth Circuit in

7  *Houston Independent School District v. Bobby R.*, 200 F.3d 341, 348–49 (5th Cir. 2000).[7]

8          In *Bobby R.*, the court wrote that "to prevail on a claim under the IDEA, a party

9  challenging the implementation of an IEP must show more than a *de minimis* failure to implement

10 all elements of that IEP, and, instead, must demonstrate that the school board or other authorities

11 failed to implement substantial or significant provisions of the IEP." *Bobby R.*, 200 F.3d at 349

12 (concluding that conceded implementation failures did not violate the IDEA because "the

13 significant provisions of [the child's] IEP were followed, and, as a result, he received an

14 educational benefit").

15         Thus, a court reviewing failure-to-implement claims under the IDEA must ascertain

16 whether the aspects of the IEP that were not followed were "substantial or significant," or, in

17 other words, whether the deviations from the IEP's stated requirements were "material".  "A

18 material failure occurs when there is more than a minor discrepancy between the services a school

---

[7] *See Neosho R-V School Dist. v. Clark*, 315 F.3d 1022, 1027 n. 3 (8th Cir 2003) (The IDEA is violated "if there is evidence that the school actually failed to implement an essential element of the IEP that was necessary for the child to receive an educational benefit."); *Van Duyn*, 502 F.3d at 822  (Holding that "a material failure to implement an IEP violates the IDEA."); *Fisher v. Stafford Township Board of Education*, 289 Fed.Appx. 520, 524 (3rd Cir. 2008) (*De minimis* failure to comply with individual education plan did not deprive student of free appropriate public education.); *Sumter County School Dist. 17 v Heffernan ex rel. TH*, 642 F.3d 478, 484 (4th Cir. 2011) (A failure to implement a material portion of a student's IEP violates the IDEA.); *Woods v. Northport Public School*, 487 Fed.Appx. 968, 975 (6th Cir. 2012); *A.P. v. Woodstock Bd. of Educ.*, 370 Fed. Appx. 202, 205 (2nd Cir. 2010); *Savoy v. Dist. of Columbia*, 844 F.Supp.2d 23, 31 (D.D.C. 2012) (citation omitted).

1    provides to a disabled child and the services required by the child's IEP." *Van Duyn*, 502 F.3d at

2    822. This standard does not require that the child suffer demonstrable educational harm in order to

3    prevail; "[r]ather, courts applying the materiality standard have focused on the proportion of

4    services mandated to those actually provided, and the goal and import (as articulated in the IEP)

5    of the specific service that was withheld." *Garmany v. District of Columbia*, 935 F.Supp.2d 177,

6    181 (D.C.C. Mar. 30, 2013) (citation and internal quotation marks omitted).

7            Plaintiff Colón alleges that the DOE failed to comply with ECC's 2013-2014 IEP by 1) not

8    offering access to special education services in the resource room since December of 2013; 2) not

9    replacing ECC's service assistant who left for maternity leave in February of 2014, and 3) not

10   providing the extended school year or compensatory time as required.

11           To provide a free and appropriate public education to a student with disabilities, the school

12   district must not only develop the IEP, but it also must implement the IEP in accordance with its

13   requirements. *See* 20 U.S.C. § 1401(9)(D) (A free appropriate public education includes special

14   education and related services that are "in conformity with" the IEP); 34 C.F.R. §300.323(c)(2)

15   ("As soon as possible" following development of an IEP, special education and related services

16   must be made available to a student in accordance with that IEP.) To allow the School merely to

17   write up an IEP without any requirement of implementation would fundamentally undermine the

18   purposes of the IDEA.

19           As part of ECC's 2013-2014 IEP, the School was to provide ECC with special education

20   services in its resource room. In December of 2013, the resource room instructor left the School.

21   The DOE argues that it has complied with ECC's IEP by its appointment, on September 2, 2014,

22   of a special education teacher to the resource classroom at the School.   Taking the DOE's

1   assertion as true, from December 2013 to September 2, 2014, ECC did not receive educational

2   services from a special education teacher at the School, and attended regular classes only.  As a

3   result, ECC did not receive individualized education services tailored for her specific needs in

4   accordance with her 2013-2014 IEP.

5          This court is not currently in a position to confirm the DOE's statement that there is now a

6   special education teacher appointed to the classroom. Even if the assertion is true, however,

7   Plaintiffs are likely to succeed in proving that from December 2013 through September 2014, the

8   DOE deprived ECC of special education instruction as set forth in her IEP.

9          The DOE also deprived ECC of a Service Assistant from February 2014 through August

10  2014.  Alvarado acted as ECC's Service Assistant from October 16, 2012, through February 2014,

11  when she stopped due to maternity leave. Despite Director Contreras' direct communication with

12  the DOE requesting that it appoint a new Service Assistant for ECC, the DOE failed to appoint a

13  replacement Service Assistant.  On August 8, 2014, the DOE appointed Alvarado as the Service

14  Assistant for ECC and a second minor.  On August 27, 2014, by way of letter, the DOE proposed

15  to amend its contract with Alvarado to remove the second child from her supervision. There is no

16  dispute that from February 2014 through August 8, 2014, ECC was not receiving the assistance

17  from a service assistant as set forth by her IEP.  At the time of the hearing, no amended contract

18  had been presented to Alvarado for signing.

19         Court's Exhibit 6 is a compilation of communications from Director Contreras to the DOE

20  regarding the need for special education teachers and assistants at the School.

21         • December 2013 – resource room instructor at the School resigned.
22

- January 24, 2014 – Director Contreras emailed Ana Torres, Educational Facilitator for Special Education at the DOE, regarding the vacant positions at the School and the impending maternity leave of ECC's service assistant Alvarado.  Director Contreras advises Torres that the School has been requesting a special education teacher since August 2013 and was noncompliant for one school semester with respect to over 25 special education students.

- January 29, 2014 – Torres forwarded Director Contreras' email to Carmen Rivera, Special Education Associate Secretary for the DOE, and Víctor Santiago "for follow up[.]"

- January 29, 2014 – Rivera responded to Torres and included Víctor Santiago on the response. Rivera responded:

  > The position for the [resource room] teacher who resigned [ ] is in the process of being requested from the [budget office] for the 5th round, which would be the next one. As you know, we have to wait for it to come to us with an approval before we can make an appointment. Out of the 25 students that the School Principal alleges are not being taken care of since August, the proper procedure is to complete the newly created special education teacher position request. As soon as the appropriate documentation is received it will be requested from the OMB. As to the irregular assistant, it will be requested during the 5th round for assistants, which is the one we are preparing now to send to the [budget office]. That position will be requested as a new one, to replace the [service assistant] that was [ECC]'s, and is still being placed together with [another student], for the assistant's maternity leave period.

- January 29, 2014 – Víctor Santiago responded requesting Torres to make an urgent visit to the School.

- January 30, 2014 – Torres responded to Director Contreras instructing her to apply for a new position for the resource room teacher.  Torres also advised that the DOE would request a services assistant during the next round of requests from the budget and finance department.

- February 20, 2014 – Director Contreras emailed Ana Torres, Víctor Santiago, Doris Zapata, Pablo Ortiz, María Oneill, and David Ramos. The subject line is "21st Century School Dr. Hiram González [sic], T-1 pending appointment D70136."  Director Contreras sent the message with "High Priority."  In the email, Director Contreras urged the DOE to appoint a

service assistant to replace Alvarado who was about to take maternity leave. Director Contreras stated that she is "concerned" about ECC who needs an assistant. Her concern regarding the lack of a replacement service assistant for ECC coincided with the fact that ECC has been without a resource room instructor since 2013. Director Contreras stated that the School is in "default" since the School is not properly attending to ECC (and a second student).

- February 2014 – Alvarado took maternity leave.

- May 5, 2014 – Plaintiff Colón filed the administrative complaint against the DOE.

- May 22, 2014 – Director Contreras followed up with the DOE regarding the positions still vacant for the 2014-2015 school year.

- June 17, 2014 – The ALJ held the administrative hearing, at which the DOE was present.

- June 24, 2014 – The ALJ filed the order requiring specified actions by the DOE, including ordering the appointments of a resource room special education teacher, a service assistant by August 6, 2014.

- July 4 or 5, 2014 – Director Contreras learns of the administrative complaint and ALJ's order through email.

- August 6, 2014 – Beginning of 2014-2015 school year.

- August 8, 2014 – the DOE appointed Alvarado as the Service Assistant for ECC and a second minor.

- August 13, 2014 – Director Contreras emailed the DOE a report on the vacant positions at the School. She sent the email with "High Priority." Again, Director Contreras specified the need for a resource room teacher due to the previous teacher's retirement.

- August 25, 2014 – Plaintiff Colón filed the instant suit in federal court against the DOE.

- August 26, 2014, or sometime thereafter – Director Contreras learned of the lawsuit when teachers at the School approached her to tell her about an article in the newspaper.

1   • August 27, 2014 – The DOE gave Alvarado a letter indicating that she
2     would only provide service to ECC for the remaining school year.
3
4   • September 2, 2014 – Ms. Marrero is appointed to instruct in the resource
5     room.
6
7        Although not a complete record of the interchanges between the School and the DOE, the

8   evidence gleaned from these communications shows that the DOE knowingly and willfully

9   deprived ECC of appropriate education.  The court uses terminology proper of criminal cases.

10  One acts knowingly and willfully when an act is committed with intent, with a bad purpose to

11  disobey or disregard the law, and not because of mistake, accident, or other innocent reason.  This

12  is the case here.

13       It is undisputed that ECC's previous IEPs granted her an "extended school year" for the

14  2011-2012 and 2012-2013 school years. It is also undisputed that the School did not provide the

15  extended school year to ECC as required during the 2011-2012 and 2012-2013 school years.  In

16  order to make up for the lost time, during the September 3, 2013, IEP Team meeting, the School

17  and Plaintiff Colón agreed that during the 2013-2014 academic year, ECC would receive an

18  additional hour of "compensatory time" during each of the five days of class every week.  This

19  meant that for 2013-2014, ECC would receive an extended school day of two hours per day.

20  There is no dispute, however, that ECC has not received extended school hours since January

21  2014 due to the loss of the School's resource room teacher. Failure to provide a student with an

22  extended school year constitutes a failure to properly implement an IEP. *See S.S. ex rel. Shank v.*

23  *Howard Road Academy*, 585 F.Supp.2d 56, 67 (D.D.C. Nov. 12, 2008); *Wilson v. District of*

24  *Columbia*, 770 F.Supp.2d 270, 274, (D.D.C. Mar. 18, 2011) (materially failed to implement

25  disabled student's IEP where it did not provide prescribed extended school year services).  The

1    DOE recognizes that it owes ECC compensatory time and proposes that ECC's IEP for 2014-2015

2    integrate time to compensate her for the time lost since January 2014.

3            The fact that the DOE has appointed a new resource room instructor, services assistant for

4    ECC, and intends to include compensatory time into ECC's 2014-2015 IEP does not alter

5    Plaintiffs' likelihood of success on the merits.  The court notes that the parties are in this position

6    despite having previous IEP's requiring extended school years for ECC.  The School and the DOE

7    failed to abide by material portions of previous IEPs.  Even after exercising her due process right

8    to an administrative hearing, the DOE continued to ignore its requirement to provide ECC with

9    appropriate education.  What good is an IEP if the DOE is not obligated to follow it?  The court

10   finds that the DOE's failures to comply with ECC's 2013-2014 IEP were material.  Accordingly,

11   Plaintiffs are likely to succeed on this claim as well.

12          **3.    <u>Dietary Needs</u>**

13          Plaintiffs claim that the DOE has failed to provide ECC with the approved special diet on

14   several occasions.   ECC's 2013-2014 IEP requires that the School provide ECC with a special

15   diet due to her health issues.  In ECC's 2011-2012 IEP and the minutes relating to the 2011-2012

16   IEP Team meeting, the parties stipulated to a special diet.  This stipulation carried over to ECC's

17   2012 and 2013 IEPs.

18          Due to ECC's health conditions, García, the nutritionist employed by the DOE, requested,

19   and the "School Food Authority"[8] approved, a special diet for ECC that is high in fiber, low in fat,

20   free of irritants, and diabetic friendly. (Plaintiffs' Ex. 4.) A copy of the approved diet was taken to

21   the School lunchroom for provision of the special diet.  The School's lunchroom was given a

_____

[8] Called "Autoridad Escolar de Alimentos" or "AEA" in Puerto Rico.

1   chart containing "allowed" and "not allowed" foods for both breakfast and lunch.  Plaintiff Colón

2   testified from personal knowledge that on several occasions the School gave ECC meals that were

3   not allowed under the approved diet.  Some examples of improper food given to ECC include

4   pizza, beef ravioli (with the sauce washed off), hot dogs, and sweetened cereal.  (Plaintiffs' Ex. 4.)

5          The "evidence" presented by the DOE in support of its assertion that it is compliant with

6   ECC's special diet is, **at best, comical**.[9]  García testified that her receipt of the subpoena to testify

7   at the preliminary injunction hearing was the first time she learned of Plaintiff Colón's complaints

8   regarding the School's failure to follow ECC's approved diet.  García visited the School less than

9   one week prior to the hearing in order to review the records of ECC's meals. Despite having

10  worked for the DOE as a nutritionist for six years, and despite the School having students

11  requiring specific approved special diets, prior to this visit, García had never visited the School.

12         During the hearing, the DOE provided records from two days in the Fall of 2013 as "proof"

13  that ECC was eating according to her approved diet unless authorized by Plaintiff Colón.  After

14  her visit to the School, García signed a certification stating that the School was in compliance

15  with the approved diet for ECC. However, two stand-alone days in the Fall of 2013 do not show

16  compliance.  García also testified that she was not aware at the time of the certification that ECC

17  had been served hot dogs or ravioli at the School, and stated that these items were not allowed

18  under the special diet.  It appears to the court that García's visit to the School failed to provide an

19  accurate and meaningful investigation of the on-going complaints that ECC is not receiving her

---

[9] During the hearing, the DOE went so far as to blame ECC for choosing pizza over her approved special diet.  The court agrees with Plaintiff Colón's retort, "what child wouldn't?"

1  proper nutrition.  The court finds that Plaintiffs are substantially likely to succeed in proving non-

2  compliance with ECC's special diet.

3          It incenses the court that such a simplistic requirement has been either routinely ignored or

4  deliberately evaded.  Proper nutrition is as integral a part of ECC's IEP as any other component.

5  As such, it hardly comes as a surprise given the backdrop of this matter that neither the School nor

6  the DOE seem to have taken this requirement seriously.

7          **4.      Transportation Costs**

8          Plaintiff Colón alleges that the DOE failed to pay her transportation costs incurred from

9  driving ECC to therapies ("Transportation Grant") and to the School ("Education Grant") as

10  required by ECC's 2013-2014 IEP.  Plaintiff Colón asserts that the costs should be calculated

11  according to the Public Service Commission rates as determined by the Resolution.  The DOE

12  asserts that the costs should be calculated in accordance with the rates of the Department of

13  Transportation and Public Works.

14          The DOE does not dispute that Plaintiff Colón is entitled to transportation expenses.[10]  The

15  Resolution ordered the DOE to pay transportation costs according to the rates set forth by the

16  Public Service Commission.  The DOE had a full ability to be heard at that hearing, and the ALJ

17  determined that the rates from the Public Service Commission were the appropriate rates to use.

18  This determination is final because the DOE did not seek judicial review.  *Nieves-Marquez v.*

19  *Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003) (*citing* 20 U.S.C. § 1415(i)(1)(A)).

20

--------

[10] One of Plaintiff Colón's prior cases involved suit against the DOE determining ECC's right to attend therapies outside of the School. Another of Plaintiff Colón's prior cases involved a suit against the DOE to recover previous transportation expenses.  There is no dispute that ECC appropriately attended therapy sessions outside of the School.

1    **B.**      **Likelihood of Irreparable Harm Absent Injunctive Relief**

2            Having determined that Plaintiffs are likely to succeed on the merits of their claims against

3    the DOE, the court now examines the likelihood of irreparable harm to ECC without injunctive

4    relief.  "A failure to provide a [free appropriate public education] constitutes irreparable injury."

5    *Lofton v. District of Columbia,* 2013 WL 6710352, *5 (D.C.C. Dec. 20, 2013) (*quoting Massey v.*

6    *District of Columbia*, 400 F.Supp.2d 66, 75 (D.D.C. Nov. 3, 2005).  ECC has a finite amount of

7    time to receive public educational services. Each day that she does not receive the appropriate

8    educational services is another day that ECC's educational progress is delayed.  Although the

9    implementation of compensatory time may assist ECC to reach her grade-appropriate goals and

10   objectives, the School, and the DOE, cannot cure the harm caused by those missed weeks of the

11   required service. The system developed to protect ECC has continually failed her; even when she

12   availed herself of the administrative process and was successful, the DOE has refused to comply

13   with the IEP, the Resolution, and with the IDEA.        Similarly, the DOE's failure to abide by

14   the diet established and approved with ECC's strict dietary needs in mind is likely to cause

15   irreparable harm.  ECC's pediatrician certified the need for her to be on a diabetic-friendly diet

16   consisting of 2000 calories, high in fiber, low in fat, and free of irritants.  The DOE acknowledges

17   that the strict diet is necessary due to ECC's health conditions.  It appears though, that despite

18   knowledge of the necessity of the special diet, and the appointment of the special diet, the DOE is

19   either unable or unwilling to ensure that the diet is followed at the School.  Absent monitoring by

20   the court, it appears that the School's lunchroom will continue to allow ECC to eat pizza, or wash

21   off pasta sauce from ravioli, or serve ECC sugared cereals because it is easier than following the

22   strict diet approved by the School Food Authority.  Garcia's so-called "investigation" only serves

1   to highlight the fact that the DOE is all-too-willing to give only lip-service to ECC's IEP

2   requirements.

3           The system has failed ECC.  Time and again, her needs have been lost to the void of

4   bureaucracy.  Even when well-intentioned school officials sought assistance from the DOE, their

5   requests fell on deaf ears. Absent immediate and continued oversight by this court, it is apparent

6   that nothing for ECC will change. With regard to this second factor, the court finds that ECC's

7   present and continued lack of an IEP, along with the DOE's failure to properly implement its

8   IEPs, will cause her irreparable harm.

9   **C.      Harm that Preliminary Injunction Could Cause**

10          With regard to this third factor, the court finds that the issuance of a preliminary injunction

11  in this matter will not cause substantial injury to the DOE. The preliminary injunction is narrowly

12  tailored to ensure to remain in force only until such time that a properly developed IEP is adopted

13  and carried out while this matter is pending. Absent an injunction, it is apparent that ECC will

14  continue to receive less than she is entitled to under the IDEA.  An ongoing injunction will serve

15  to insulate the DOE from future litigation by ensuring that it remains fully compliant.  The court,

16  therefore, concludes that the DOE's compliance with the IDEA is not harm, but rather is in its best

17  interest, which also weighs in favor of issuing the requested relief.

18  **D.      Public Interest in Granting Injunctive Relief**

19          As to the final factor of the preliminary injunction analysis, the record shows that

20  injunctive relief will further the public interest.   "The public interest lies in the proper

21  enforcement of ... the IDEA and in securing the due process rights of special education students

22  and their parents provided by statute," and this public interest "outweigh[s] any asserted financial

1  harm" to the DOE. *Petties v. District of Columbia*, 238 F.Supp.2d 114, 125 (D.C.C. Nov. 22,

2  2002).  The chasm between the DOE and the School cannot be ignored.

3     Public interest will be served by providing ECC with her proper education, but also by

4  ensuring that the DOE is more responsive to school requests that are designed to fulfill the goals

5  of the IDEA.

6                                               **V.**

7                              **Preliminary Injunctive Relief**

8     Thirty-four years of ball-bouncing convinces the court that no fine, demand, instruction,

9  order, requirement, or plea will work as a remedy.  Only court intervention, with its raw power of

10 contempt authority, appears strong enough to ensure that the harm to ECC will come to an end.

11    Upon consideration of the Plaintiffs' Motion for a Preliminary Injunction, the arguments of

12 counsel at a hearing on the Motion on September 9 and 10, 2014, and the evidence submitted, it is

13 hereby **ORDERED** that the Department of Education:

14  (A) Coordinate and hold and IEP Team meeting **within fifteen (15) calendar**
15      **days of this Order** at the Bayamón School District to prepare and finalize
16      ECC's 2014-2015 IEP, and to discuss any other matter related to the special
17      education services ECC requires. The Department of Education shall notify
18      Plaintiff Colón, in writing, ten (10) days in advance of the date of the proposed
19      IEP Team meeting. The prior written notice to Plaintiff Colón shall include a
20      draft 2014-2015 IEP for ECC and all other notice requirements provided under
21      the IDEA in 20 U.S.C. § 1415(c)(1).  All persons set forth in 20 U.S.C.A.
22      § 1414(d)(1)(B) shall be present at the IEP Team meeting.  The invitation to
23      the IEP Team meeting shall be extended to Ms. Alvarado.

24
25      In the event that the parties agree to a date for the IEP Team meeting with less
26      than ten (10) days' notice, the DOE shall advise the court of the date of the
27      IEP Team meeting, the method of notice, the method of acceptance by
28      Plaintiff Colón, and identify the persons attending the IEP Team meeting.
29

The parties shall notify the court **within three (3) days upon completion of the IEP Team meeting**. The notice shall include a list of all persons who attended the meeting and copies of the 2014-2015 IEP and the minutes from the IEP Team meeting.  The notice shall be restricted to the parties and court only.

(B) Determine the amount owed to Plaintiff Colón in transportation grants according to the Public Service Commission rates and make payment to Plaintiff Colón for the amount owed **within fifteen (15) calendar days of this Order**.

(C) Ensure compliance with the approved special diet for ECC. The DOE shall direct the nutritionist to make unannounced visits to the School during lunchtime at least three times per month throughout this injunction. The purpose of the lunchtime visits is to observe the School's adherence to special diets and collect information regarding the meals offered to the students and ECC in particular.  The nutritionist shall prepare a report of each of the visits and submit the report to the DOE and the School. The report must (1) identify the nutritionist; (2) identify the methods used to obtain the information in the report; and (3) state with particularities the findings by the nutritionist. The DOE shall file a copy of the report with the court **within three (3) days of each visit to the School by the nutritionist**.

(D) Formally amend Ms. Alvarado's contract for employment to incorporate the amendments effective at or near the end of August.  The DOE shall provide a copy of Ms. Alvarado's amended contract to the court **within fifteen (15) calendar days of this Order**.

(E) Provide a copy of this Order **within twenty-four (24) hours** to:
   a. Director Contreras;
   b. The Associate Secretary for Special Education at the DOE;
   c. The Special Education Teacher Facilitator at the DOE;
   d. The Director of The State Agency, Food and Nutrition Services (AESAN);
   e. The Director of the School Food Authority (AEA);
   f. The person or persons in charge of the budget and/or in financial control for the appointments of special education teachers and assistants; and
   g. The Secretary of the DOE.

The DOE and counsel for the DOE shall file a Notice of Service with the court identifying the above listed individuals by name and stating the method of service.

1       (F)  Notify the court **within three (3) days**, of any material changes at the School
2           that could affect the School's ability to follow ECC's IEP, e.g., teacher
3           resignations or leaves of absences.
4
5       In the event of noncompliance with this injunction order, any person or party found to be

6   noncompliant after a hearing on the matter will be held in civil or criminal contempt, including

7   incarceration and any other remedies available to the court.

8       The court reminds that it has the authority to hold a non-party in contempt for knowingly

9   violating its orders. "It is well-settled that a court's contempt power extends to non-parties who

10  have notice of the court's order and the responsibility to comply with it." *Chicago Truck Drivers*

11  *v. Bhd. Labor Leasing*, 207 F.3d 500, 507 (8th Cir. 2000)); *see also ClearOne Communs., Inc. v.*

12  *Bowers*, 651 F.3d 1200, 1215–16 (10th Cir. 2011).  Fed. R. Civ. P. 71 grants district courts the

13  power to enforce orders against "a person who is not a party ... as if a party."  It states, "[w]hen an

14  order grants relief for a nonparty or may be enforced against a nonparty, the procedure for

15  enforcing the order is the same as for a party." *Id*.

16      Federal Rule of Civil Procedure 65(d)(2) provides three categories of persons that an

17  injunction may bind. The first, of course, is the parties themselves. Fed. R. Civ. P. 65(d)(2)(A).

18  The second is the parties' officers, agents, servants, employees, and attorneys.  Fed. R. Civ.

19  P. 65(d)(2)(B). The third is "persons who are in active concert or participation" with a party or its

20  officers, agents, servants, employees, or attorneys. Fed. R. Civ. P. 65(d)(2)(C).

21      No one should doubt that incarceration will take place for any non-cooperating and/or

22  noncompliant individual.  No extensions will be granted.  The terms set here are written in stone

23  because this court is not going to be a party to the thirty-four year debacle discussed in the

24  beginning of this order.

1                                    **VI.**

2                               **Conclusion**

3          Based upon the manner in which all these deficiencies occurred, it is the view of the court

4    that ECC's plight is likely one suffered by many, many more Puerto Rican students.  It is only

5    because of the tenacity of ECC's guardian that these issues have been brought into the light.  It is

6    the court's sincere hope that Justice Brandeis was correct and that, indeed, sunshine is the best

7    disinfectant --- that a full airing of all of the failings of the DOE with respect to only this one

8    student will compel Puerto Rico as a whole to examine its failing school system.  Now, with court

9    intervention, the DOE will have no choice but to fulfill its decades-old responsibility to Puerto

10   Rico's children.  Perhaps, just perhaps, this will be the final time that court intervention is

11   necessary for ECC.  Perhaps the DOE will be as ashamed of its conduct as this court is and will

12   seek a remedy that will benefit not only ECC but all others that have faced similar issues in our

13   school system.  Perhaps the future of all of Puerto Rico's students will be as bright as the future

14   ECC could receive, sadly, only through litigation.

15          For the reasons set forth in this Opinion and Order, Plaintiffs' Motion for Preliminary

16   Injunction is, hereby, **GRANTED**.

17          **IT IS SO ORDERED.**

18          San Juan, Puerto Rico, this 23rd day of September, 2014.

19                                                  S/José Antonio Fusté
20                                                  JOSE ANTONIO FUSTE
21                                                  U. S. DISTRICT JUDGE